**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | |
|---|---|
| **AEROGLOBAL CAPITAL MANAGEMENT, LLC.,** : | |
| **a Delaware Limited Liability Company,** : | |
| : | |
| **Plaintiff,** : | |
| : | **C.A. NO.** |
| **v.** : | |
| : | |
| **CIRRUS INDUSTRIES, INC.,** : | |
| **a Delaware Corporation, CIRRUS HOLDING** : | **JURY TRIAL DEMANDED** |
| **COMPANY LIMITED, a Cayman Islands Corporation,** : | |
| **CRESCENT CAPITAL INVESTMENTS, INC.,** : | |
| **a Delaware Corporation, FIRST ISLAMIC** : | |
| **INVESTMENT BANK, E.C., a Bahrain Investment** : | |
| **Bank, ALAN L. KLAPMEIER, DALE E. KLAPMEIER,** : | |
| **PETER P. McDERMOTT, II, JOHN N.  DYSLIN,** : | |
| **SIMA GRIFFITH, MARWAN ATALLA,** : | |
| **WILLIAM J. MIDON, and WILLIAM C. WOOD,** : | |
| : | |
| **Defendants.** : | |

_____ :

## COMPLAINT

Plaintiff AeroGlobal Capital Management, LLC ("AeroGlobal"), by its counsel and for its complaint against the defendants, states as follows:

### NATURE OF THE ACTION

1.      Plaintiff AeroGlobal was formed in April, 2001 for the purpose  of acquiring a substantial percentage of the shares of capital stock of defendant Cirrus Industries, Inc. ("Cirrus"), one of the world's leading manufacturers of small, single-engine piston aircraft. In June, 2001, AeroGlobal and Cirrus entered into a contract under which Cirrus agreed to sell to AeroGlobal, for a purchase price totaling $45,000,000, approximately 35% of Cirrus' common stock.  Beginning on or about June 18, 2001, in the reasonable belief that Cirrus would proceed

in good faith to meet its contractual obligations (including an explicit obligation to cease and

desist from all negotiations to sell capital stock to any persons other than AeroGlobal),

AeroGlobal made its initial investment of $12,000,000 under its contract with Cirrus.  A

substantial portion of that initial investment -- $5,000,000 -- was earmarked by AeroGlobal and

Cirrus to pay a "break-up" or termination fee to defendant First Islamic Investment Bank, E.C.

("First Islamic") and its agent and wholly owned affiliate defendant Cirrus Holding Company

Limited ("CHCL"), to enable Cirrus to terminate all dealings with First Islamic in connection

with an earlier arrangement whereby Cirrus was to sell 61% of its capital stock to First Islamic

for $77,500,000.

       2.     Cirrus accepted AeroGlobal's initial $12,000,000 payment, and from June

18 until July 30, 2001 represented to AeroGlobal that Cirrus had terminated all dealings with

CHCL, and was proceeding in good faith toward the implementation of all of the transactions

contemplated by the Cirrus-AeroGlobal contract. In reliance on Cirrus' repeated proclamations

of good faith, AeroGlobal invested substantial additional amounts, including substantial legal

fees and expenses, in proceeding toward implementation of the transactions contemplated by the

parties' contract.  Also in reliance on Cirrus' proclaimed good faith, AeroGlobal expended

substantial amounts to assist Cirrus in resisting a lawsuit initiated by CHCL in an effort to have a

court enjoin performance of the Cirrus-AeroGlobal contract and resurrect the proposed Cirrus-

CHCL stock acquisition.  AeroGlobal was prepared to fund the final $3,000,000 of the initial

investment when CHCL's lawsuit was filed but, in light of the lawsuit, Cirrus and AeroGlobal

agreed to defer the $3,000,000 payment.

3.      Unbeknownst to AeroGlobal, and in direct contravention of Cirrus' representations and proclamations of good faith, Cirrus -- and in particular its senior executives and directors Alan and Dale Klapmeier -- never intended to honor its contract with AeroGlobal, and instead used the prospect of the AeroGlobal transaction as a "stalking horse" and negotiating lever to extract more money from First Islamic in exchange for First Islamic's purchase of a majority of the Cirrus' capital stock, and to obtain extraordinary personal financial benefits for Alan and Dale Klapmeier.

4.      On July 19, 2001, the Court in which CHCL had filed its lawsuit ruled that CHCL was not entitled to a preliminary injunction to stop AeroGlobal and Cirrus from implementing the stock acquisition contemplated by their contract.  At that time, and for a period thereafter, Cirrus reaffirmed its representations to AeroGlobal that Cirrus would proceed in good faith to implement the AeroGlobal-Cirrus contract.

5.      Despite (a) explicit provisions in the AeroGlobal-Cirrus contract prohibiting Cirrus and First Islamic from continuing after June 17, 2001 to discuss or negotiate an acquisition of Cirrus' capital stock by First Islamic, (b) Cirrus' acceptance of AeroGlobal's initial $12,000,000 investment, (c) Cirrus' repeated representations and assurances that it was proceeding in good faith to implement all of the transactions contemplated by the AeroGlobal-Cirrus contract, and (d) Cirrus' representations and assurances that it would use a portion of AeroGlobal's money to pay First Islamic the $5,000,000 "break-up" fee and thereby terminate all further dealings with First Islamic, Cirrus, beginning sometime prior to July 12, 2001, entered into a course of secret negotiations with First Islamic with a view to selling First Islamic a controlling interest in Cirrus, enriching the Klapmeiers, and abandoning the AeroGlobal-Cirrus

-3-

contract.  These negotiations were concealed from AeroGlobal, and culminated in a secret vote by Cirrus' board of directors on or about July 30, 2001 to abandon further dealings with AeroGlobal and to walk away from the AeroGlobal-Cirrus contract.  Even <u>after</u> the secret vote to abandon the AeroGlobal contract, Cirrus kept up the facade of preparing to implement the contract with AeroGlobal, in a final effort to wring the last $3,000,000 installment of bridge-loan funds from AeroGlobal, and to forestall any claim for repayment of the first $12,000,000 installment and of other amounts.  Many of the facts and circumstances concerning this scheme came to light only after, and as a result of, litigation brought by AeroGlobal against several of the defendants herein in a state court in Delaware for breach of the letter of intent, tortious interference with the letter of intent, bad faith, and civil conspiracy.  That state court litigation remains pending.

6.     AeroGlobal brings this action against Cirrus and its controlling officers for money damages for the losses suffered as a result of Cirrus' fraud in executing the AeroGlobal-Cirrus contract with the intent not to proceed with the transactions contemplated therein, and  against Cirrus for breach of that contract, including losses suffered as a result of Cirrus' breach of the covenant of good faith and fair dealing implied in that contract. AeroGlobal also brings the action against First Islamic, CHCL and their affiliate Crescent Capital Investments, Inc., as well as other individual defendants -- Midon, Atalla, Wood, Griffith and Dyslin -- for money damages for the losses suffered as a result of those defendants' tortious interference with the AeroGlobal-Cirrus contract, and their conspiracy to injure AeroGlobal and deprive it of its rights and money.  Finally, AeroGlobal seeks the imposition of

a constructive trust on Cirrus, its assets and its common stock in order to protect and preserve AeroGlobal's bargained-for interest in the company.

## **PARTIES**

7.    Plaintiff AeroGlobal is Delaware limited liability company with its principal place of business in Palm Beach, Florida.  AeroGlobal was organized on April 30, 2001 for the purpose of acquiring a minority interest in the capital stock of Cirrus.

8.    Defendant Cirrus is a Delaware corporation with its headquarters and principal place of business in Duluth, Minnesota.  Cirrus is engaged in the business of designing, developing and manufacturing single-engine piston aircraft for use in the general aviation industry.  Cirrus' two aircraft models, known as the SR20 and SR22, are two of only three U.S.-produced single-engine piston aircraft in their class to have received a Type Certification from the Federal Aviation Administration in the last 15 years.

9.    Defendant First Islamic Investment Bank, E.C. ("First Islamic") is an investment bank organized under the laws of Bahrain.  First Islamic operates in the United States of America through its wholly owned subsidiary and agent, defendant Crescent Capital Investments, Inc.

10.    Defendant CHCL is a Cayman Island Company organized by First Islamic on April 21, 2001 as a vehicle for First Islamic's acquisition of a majority interest in Cirrus' capital stock.  CHCL does business in the United States through the agency of defendant Crescent Capital Investments, Inc.  CHCL operates wholly at the direction and under the control of First Islamic, and any authority that CHCL has derives solely from that granted to it by First Islamic.

11.     Defendant Crescent Capital Investments, Inc. ("Crescent Capital") is a Delaware corporation with its principal place of business in Atlanta, Georgia. At all relevant times Crescent Capital acted as the agent of CHCL and First Islamic and under First Islamic's direction and control, in connection with First Islamic's effort to acquire a majority interest in the capital stock of Cirrus, and in connection with the efforts of First Islamic to interfere with the AeroGlobal-Cirrus relationship, and any authority that Crescent Capital has derives solely from that granted to it by First Islamic.

12.     Defendant John N. Dyslin ("Dyslin") is a director of Crescent Capital and, at all relevant times, Dyslin acted as the agent of CHCL, Crescent Capital and First Islamic and under First Islamic's direction and control, in connection with First Islamic's effort to acquire a majority interest in the capital stock of Cirrus, and in connection with the efforts of First Islamic to interfere with the AeroGlobal-Cirrus relationship, and any authority that Dyslin has derives solely from that granted to him by First Islamic and Crescent Capital.

13.     Defendant Marwan Atalla ("Atalla") is, on information and belief, an individual resident of the State of Texas and is a citizen of either that State or of the Kingdom of Jordan, and at all relevant times was a member of Cirrus' Board of Directors.

14.     Defendant William J. Midon ("Midon") is, on information and belief, an individual resident and citizen of the Commonwealth of Massachusetts, and at all relevant times was a member of Cirrus' Board of Directors.

15.     Defendant William J. Wood ("Wood"), also known as "Bucky," is, on information and belief, an individual resident and citizen of the State of Alabama, and at all relevant times was a member of Cirrus' Board of Directors.

16.     Defendant Sima Griffith ("Griffith") is, on information and belief, an individual resident and citizen of the State of Minnesota, and is and at all relevant times was an employee or representative of Aethlon Capital, LLC, which acted as a broker or "finder" for Cirrus in connection with its effort to raise financing through the sale of its stock to First Islamic, CHCL and Crescent Capital.

17.     Defendant Alan L. Klapmeier is, on information and belief, an individual resident and citizen of the State of Minnesota and, at all relevant times, was a director and the Chief Executive Officer of Cirrus.

18.     Defendant Dale E. Klapmeier is, on information and belief, an individual resident and citizen of the State of Minnesota and, at all relevant times, was a director and chief operating officer of Cirrus.

19.     Defendant Peter P. McDermott, II, is, on information and belief, an individual resident and citizen of the State of Minnesota and, at all relevant times, was the chief financial officer of Cirrus.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this matter pursuant to 15 U.S.C. § 78aa, 28 U.S.C. § 1331, 28 U.S.C. § 1337 and 28 U.S.C. § 1367(a).

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, in that the misrepresentations made to AeroGlobal were made in or directed to AeroGlobal representatives in various jurisdictions, including in the Eastern District of Pennsylvania.

## FACTUAL BACKGROUND

22.    Beginning in the fall of 2000, Cirrus began searching for one or more investors to invest millions of dollars in Cirrus to ensure the company's survival as a going concern.  In conjunction with Cirrus' efforts, the Klapmeiers also sought buyers for their substantial interests in Cirrus, with the goal of securing as much money as possible for themselves while simultaneously securing funding for Cirrus' operations.

23.    In furtherance of its search for investors, Cirrus engaged the investment banking firm Advest, Inc. ("Advest") in October 2000 to solicit and investment of $20,000,000 in Cirrus.  Cirrus also engaged Oaks Fitzwilliams & Co. to assist in the placement of 200,000 shares of preferred stock that would be sold to raise the $20,000,000.  In February 2001, Cirrus terminated its plan to raise $20,000,000 through the sale of preferred shares because it could not obtain a commitment by one or more investors to purchase at least $20,000,000 worth of preferred stock of Cirrus.

24.    In March 2001, Advest introduced Madison Partners ("Madison") as a potential lead investor in a private equity financing in the amount of $34,000,000, which was contemplated to be raised by the sale of preferred stock in Cirrus.

25.    On March 13, 2001, Cirrus' board of directors voted to accept the proposal by Madison/Advest to secure the investment of $34,000,000 in Cirrus.

26.    The Cirrus shareholders approved the Madison/Advest financing plan on March 28, 2001.

27.    Sometime in or prior to February, 2001, Cirrus retained the services of Aethlon Capital, LLC ("Aethlon") to solicit the investment of tens of millions of dollars in Cirrus.

28.     In March 2001, Aethlon introduced Cirrus to Crescent Capital and First Islamic, and First Islamic expressed an interest in acquiring a majority majority of Cirrus' capital stock for an amount in excess of $50,000,000.  In April 2001, Cirrus' senior management met with representatives of Crescent Capital to discuss, and to begin to negotiate, the terms and structure of a proposed investment by First Islamic, including interim financing and repayment of indebtedness, as well as the terms of agreements pursuant to which Alan and Dale Klapmeier would be employed by Cirrus following First Islamic's acquisition of control of Cirrus.

29.     On April 17, 2001, Crescent Capital forwarded to Cirrus a letter of intent that outlined the terms of a proposed equity investment in Cirrus by First Islamic.

30.     In April, 2001, the Cirrus Board voted to terminate Cirrus' agreement with Madison/Advest in favor of the proposed equity investment by First Islamic.

31.     Meanwhile, Cirrus had also asked an individual named Keith Fitzgerald to seek other investors who might also be willing to invest tens of millions of dollars in Cirrus.  Mr. Fitzgerald was an independent contractor for Cirrus who had raised millions of dollars of capital for Cirrus over the preceding years.

32.     On or about April 20, 2001, Mr. Fitzgerald met with one Craig Millard regarding a possible investment in Cirrus.  Mr. Millard decided, that same day, to loan Cirrus $500,000 that could be converted to common shares in Cirrus.  Mr. Millard also expressed his interest in forming a group, which later became plaintiff AeroGlobal, to invest tens of millions of dollars in Cirrus.

33.     AeroGlobal was formed in April, 2001 by Mr. Millard, a company owned by Mr. Fitzgerald, and an entity called GH Venture Partners, LLC, a merchant bank based in

New York, New York.  Mr. Fitzgerald and the principals of GH Venture Partners, Christopher

Moe and Ralph Isham, had extensive experience in raising capital for investment in starter and

"second stage" companies such as Cirrus, and they, along with Mr. Millard, formed AeroGlobal

to facilitate investments in aircraft manufacturers, and in particular Cirrus.

34.    On April 24, 2001, Cirrus and First Islamic, acting through its agent

Crescent Capital, executed a letter of intent under which First Islamic would invest $77,500,000

in Cirrus in exchange for 61% of Cirrus' outstanding capital stock, entitling First Islamic to

control Cirrus' business affairs, including the election of all members of Cirrus' board of

directors.  In addition, First Islamic advanced to Cirrus a $4,000,000 "bridge loan" in April,

2001.

35.    On June 7, 2001, Cirrus and CHCL, which was acting as First Islamic's

agent, entered into a Stock Purchase Agreement pursuant to which Cirrus agreed to sell and First

Islamic agreed to purchase 61% of the shares of Cirrus' common stock on a "fully diluted" basis,

that is, after the conversion or assumed conversion into Cirrus common stock of Cirrus'

outstanding convertible preferred stock and convertible debt, and after the exercise or assumed

exercise of certain warrants and options to purchase shares of Cirrus' common stock.  The

purchase price to be paid to Cirrus under the Stock Purchase Agreement was approximately

$2.79 per share.

36.    The June 7, 2001 Stock Purchase Agreement also provided that Alan and

Dale Klapmeier would each execute a non-competition agreement and, in exchange, would

receive six annual payments of $500,000, and that each would receive immediately vested and

exercisable options to purchase up to 3% of Cirrus' outstanding common stock at a per share

exercise price of $3.00.  The June 7, 2001 Stock Purchase Agreement further obligated Cirrus to pay a $5,000,000 termination fee to First Islamic if Cirrus decided not to proceed with the transactions contemplated by that agreement.

37.     First Islamic planned to "syndicate" its investment in Cirrus to wealthy investors in the Middle East, making a profit on its investment by selling marked up shares of an entity formed and controlled by First Islamic that would formally hold the Cirrus stock acquired by First Islamic through the June 7 Stock Purchase Agreement.

38.     In May, 2001, AeroGlobal had expressed an interest in purchasing a minority interest in Cirrus' common stock in exchange for an investment of $45,000,000. Because of so-called "no talk/no shop" provisions contained in a letter of intent entered into between Cirrus and CHCL in April, 2001, however, Cirrus had been unwilling to discuss a possible stock acquisition with AeroGlobal at that time.  Under its June 7 Stock Purchase Agreement with CHCL, Cirrus was explicitly permitted to enter into discussions and negotiations with AeroGlobal, and did so beginning on June 8, 2001.

39.     Defendants Alan Klapmeier and Dale Klapmeier met with AeroGlobal principals Craig Millard, Keith Fitzgerald, Christopher Moe and Ralph Isham at Mr. Millard's home in Newport, Rhode Island on Jule 8, 2001 to discuss AeroGlobal's proposed $45,000,000 investment in Cirrus.  At that meeting, AeroGlobal made it clear that it intended to syndicate the investment in Cirrus to other investors.  In other words, just as First Islamic had done with its proposed $77,500,000 investment, AeroGlobal, too, planned to raise money from outside investors by selling those investors shares in AeroGlobal.  Mr.  Millard, as one of AeroGlobal's

principals, also committed to use his personal funds to satisfy however much of AeroGlobal's investment commitment was not successfully syndicated to outside investors.

40.    At sometime prior to June 14, 2001, Cirrus' senior management and certain members of Cirrus' board of directors - - and in particular defendants Alan Klapmeier, Dale Klapmeier, and Marwan Atalla - - learned that First Islamic planned to earn extraordinary returns on its investment in Cirrus by reselling Cirrus' stock, or securities representing interests in Cirrus' stock, to Mideast investors at an inflated price.  Prior to June 18, 2001, Cirrus, acting through Sima Griffith, communicated to First Islamic's agent Crescent Capital that the mark-up of the price of Cirrus' stock could jeopardize the consummation of First Islamic's investment in Cirrus.

41.    Prior to June 17, 2001, and having learned of the proposed mark-up of the price of Cirrus' stock, Cirrus' senior management, and in particular Alan Klapmeier, Dale Klapmeier and Peter McDermott, concluded that Cirrus should create the appearance of intending to consummate a stock acquisition transaction with AeroGlobal as a means of inducing First Islamic to increase the monetary value of its proposed investment in Cirrus, and in particular to increase the amount that Cirrus' board members and senior management would receive as a result of a First Islamic acquisition.  In other words, Cirrus decided to use the prospect of a sale to AeroGlobal as a "stalking horse" and negotiating lever to enhance the financial value of First Islamic's proposed investment in Cirrus, and in particular to increase the amount that the Klapmeiers would receive from First Islamic.

42.    On June 17, 2001, Cirrus and AeroGlobal entered into a binding letter of intent (the "Letter of Intent") relating to AeroGlobal's proposed acquisition of a minority interest

-12-

in Cirrus' common stock.  The Letter of Intent, a copy of which is attached as Exhibit "A"

hereto, provided in substance as follows:

        (a)      Under Section 1.a, AeroGlobal committed to provide Cirrus with a

total of $15,000,000 in the form of a so-called "bridge loan."  Interest on the outstanding

principal amount of the bridge loan, at the rate of 10% per annum, was payable monthly in

arrears beginning on July 1, 2001, and the entire principal amount plus accrued interest was

payable on demand at any time after July 1, 2002 if the other transactions contemplated by the

Letter of Intent had not been consummated by that time.  In addition, the parties agreed that the

bridge loan would be convertible into shares of Cirrus' common stock or, if closing of the stock-

sale transaction contemplated by the Letter of Intent did not occur by a certain date, into a new

series of Cirrus' convertible preferred stock.

        (b)      Under Section 1.b, Cirrus agreed immediately to issue to

AeroGlobal warrants to purchase shares of Cirrus' common stock at a price between $4.25 and

$6.00 per share, in an aggregate amount of at least $750,000 and up to a maximum of

$2,250,000.

        (c)      Under Section 1.c, Cirrus agreed to pay AeroGlobal a commission

equal to five percent of all funds advanced to Cirrus pursuant to the Letter of Intent, including

the funds advanced pursuant to the bridge loan provisions of Section 1.a.  Such commission was

due and payable at the time of each such advance, and could be deducted from each advance by

AeroGlobal.

        (d)      Under Section 1.d, Cirrus agreed to utilize $5,000,000 of the

proceeds of the bridge loan from AeroGlobal to pay First Islamic, or entities controlled by First

Islamic, a "termination fee" payable under Section 11.1.7 of the Cirrus-CHCL Stock Purchase Agreement, which payment would enable Cirrus to terminate its relationship with First Islamic and proceed to implement all of the transactions contemplated by the AeroGlobal-Cirrus Letter of Intent.

(e)     Under Section 2.a, Cirrus agreed to negotiate and enter into a stock purchase agreement with AeroGlobal whereby Cirrus would sell and AeroGlobal would purchase $30,000,000 worth of Cirrus' common stock in addition to the $15,000,000 worth of stock to be owned by AeroGlobal upon conversion of the bridge loan, at a purchase price of $4.25 per share.  Cirrus agreed further under Section 2.a that the aggregate number of shares to be sold to AeroGlobal in all of the transactions contemplated by the Letter of Intent would equal at least 35% of the total number of outstanding shares of Cirrus' common stock, and would give AeroGlobal at least a 35% share of the voting power in the company.

(f)     Under Section 2.b, Cirrus agreed to appoint AeroGlobal as Cirrus' exclusive advisor to arrange for any additional financing necessary for the conduct of Cirrus' business.

(g)     Under Section 3.c, Cirrus agreed to indemnify AeroGlobal and hold it and its members harmless against any liability they might incur as a result of or in connection with Cirrus' agreements with CHCL, Cirrus' entry into the letter of intent with AeroGlobal, or the consummation of any of the transactions contemplated by the Letter of Intent.

(h)      Under Section 2.c, Cirrus agreed to "terminate its obligations to [CHCL] under the ... [June 7, 2001] Stock Purchase Agreement on terms reasonably satisfactory to [AeroGlobal] as soon as practicable."

(i)      Under Section 2.d, Cirrus agreed to use the proceeds of the bridge loan to "satisfy all obligations owed by it or any of its affiliates" to First Islamic, which included the $4,000,000 bridge loan advanced to Cirrus by First Islamic in April, 2001.

43.      Members of Cirrus' board and of Cirrus' senior management, including, inter alia, defendants Alan and Dale Klapmeier, McDermott, Midon, Wood and Atalla, never intended to permit or cause Cirrus actually to go through with the AeroGlobal transaction. Indeed, upon the execution of the AeroGlobal Letter of Intent, and at a meeting of the Board of Directors of Cirrus that occurred on or about June 18, 2001, defendant Midon stated, in substance, that Cirrus was now in a position to take the Letter of Intent to First Islamic and attempt to leverage a better deal for Cirrus from First Islamic. Cirrs proceeded to do precisely that, while continuing to represent falsely to AeroGlobal that Cirrus intended to proceed to implement its deal with AeroGlobal.

44.      On June 18, 2001, Crescent Capital personnel telephoned defendant Wood at his office and spoke to him for approximately 40 minutes regarding the existing First Islamic-Cirrus stock purchase agreement and the AeroGlobal Letter of Intent. During that telephone call, upon information and belief, defendant Wood, in furtherance of Cirrus' plan to use the AeroGlobal letter of intent as a stalking horse to obtain a better deal from First Islamic, informed First Islamic that it would have to offer more money to Cirrus and to the Klapmeiers in order for Cirrus to terminate its agreement with AeroGlobal and sell its capital stock to First Islamic.

-15-

45.    On or about June 18, 2001, in furtherance of the plan to use the AeroGlobal Letter of Intent as a stalking horse and negotiating lever, Cirrus, acting through Alan Klapmeier, agreed with First Islamic, acting through its agent Crescent Capital, that the payment of the $5,000,000 termination fee would be deferred until such time, if any, that First Islamic demanded payment of that fee in writing.  To conceal this agreement, Alan Klapmeier and the other defendants falsely represented to AeroGlobal that they had tendered the fee to First Islamic, but First Islamic refused to accept it.

46.    On or about June 20, 2001, First Islamic, acting through its agent Crescent Capital, proposed a new stock purchase transaction to Cirrus under which First Islamic would purchase 61% of the capital stock of Cirrus for approximately $82,500,000.  Because of Cirrus' desire to engage in "hard-ball" negotiations with First Islamic and to get the maximum possible leverage out of the AeroGlobal Letter of Intent, Cirrus refused to discuss the stock acquisition with Crescent Capital during the week following the execution of the Letter of Intent.

47.    On or shortly prior to June 18, 2001, AeroGlobal funded the first $5,000,000 of the bridge loan under Section 1.a of the Letter of Intent.  Cirrus accepted the $5,000,000 payment, which the parties understood and agreed would be used by Cirrus, pursuant to Sections 1.d and 3.c of the Letter of Intent, to satisfy Cirrus' obligation to pay a termination fee to CHCL under the Cirrus-CHCL Stock Purchase Agreement.  On June 18, Cirrus purported to tender AeroGlobal's $5,000,000 to First Islamic or one of its affiliates, but First Islamic or its agents and/or affiliates purported to refuse to accept the tender, and instead proclaimed that Cirrus was in breach of the Stock Purchase Agreement.  Cirrus, of course, did not disclose to

AeroGlobal that the purported tender of the termination fee was simply a ruse to mislead AeroGlobal.

48.     On or about June 21, 2001, AeroGlobal funded the next $7,000,000 of the bridge under Section 1.a of the Letter of Intent. Cirrus accepted the additional $7,000,000 payment and promptly wired $4,000,000 of that amount to repay a bridge loan advanced to Cirrus by First Islamic in or about April 2001, and used the balance to fund Cirrus' working capital needs.

49.     On June 27, 2001, CHCL, acting at the direction and control of Crescent Capital and First Islamic, initiated a lawsuit in the Court of Chancery of the State of Delaware against Cirrus and AeroGlobal (the "Chancery Action"). In the Chancery Action CHCL sought a preliminary and permanent injunction to prevent completion of the AeroGlobal-Cirrus stock acquisition contemplated by the Letter of Intent, and also sought to compel specific performance of the Cirrus-CHCL stock purchase transaction contemplated by the Stock Purchase Agreement. A principal basis of CHCL's claims in the Chancery Action was the contention that none of the transactions contemplated by the Letter of Intent constituted an "Alternative Transaction" that had been "consummated" within the meaning of Section 11.1.7 of the Stock Purchase Agreement, and that therefore Cirrus' purported effort to terminate the agreement pursuant to that Section had been ineffective.

50.     Within two days of the filing of the Chancery Action, Alan Klapmeier telephoned Crescent Capital personnel and suggested that First Islamic had been "crazy" to file the lawsuit. Alan Klapmeier expressed to Crescent Capital during that telephone conversation that the filing of the lawsuit was not conducive to Cirrus and First Islamic reaching a new stock

purchase agreement. Notwithstanding the filing of the Chancery Action that Alan Klapmeier's admonition to Crescent Capital, he and other Cirrus management personnel determined to continue their secret negotiations with First Islamic, and to use a hoped-for victory in the Chancery Action as a means of obtaining even more bargaining leverage over First Islamic.

51.    As described above, at the time that the Chancery Action was initiated on June 27, AeroGlobal had already funded $12,000,000 of the $15,000,000 bridge loan provided for in Section 1.a of the Letter of Intent. Shortly after the Chancery Action was filed, Cirrus and AeroGlobal reached an understanding to the effect that payment of the $3,000,000 balance of the bridge loan would be deferred pending final resolution of CHCL's motion for a preliminary injunction.

52.    From and after the filing of the Chancery Action and CHCL's motion for preliminary injunction, Cirrus purported to cooperate with AeroGlobal in defending against the action and motion, and Cirrus continued to represent to AeroGlobal that, if the parties' defense of the motion was successful, Cirrus would proceed expeditiously to implement the stock purchase transaction contemplated by the Letter of Intent. Among other things, Cirrus represented to AeroGlobal and to the Court of Chancery that the bridge loan transaction constituted an "Alternative Transaction" within the meaning of Section 11.1.7 of the Cirrus CHCL Stock Purchase Agreement, and that such transaction had indeed been "consummated" by AeroGlobal's funding of $12,000,000 of the bridge loan pursuant to the Letter of Intent. In addition, Cirrus adopted AeroGlobal's representation to the Court that the two parties had "reached an understanding that, because of [the Chancery Action], the payment of the final $3,000,000 increment of AeroGlobal's bridge loan may be deferred."

53.    From and after the filing of the Chancery Action and CHCL's motion for preliminary injunction, AeroGlobal engaged in substantial due diligence in furtherance of the AeroGlobal Letter of Intent, and Cirrus purported to cooperate with AeroGlobal in connection with those efforts.

54.    In accordance with the understanding between Cirrus and AeroGlobal regarding the final $3,000,000 increment of AeroGlobal's bridge loan, Mr. Millard committed under oath to provide that $3,000,000 to Cirrus upon the successful defense of CHCL's motion for a preliminary injunction and after the expiration of the period during which CHCL/First Islamic could seek appellate review of an order denying the motion for preliminary injunction. At no time prior to July 30, 2001 did Cirrus ever state to AeroGlobal that Mr. Millard's commitment was insufficient to ensure that such funds would be paid to Cirrus upon the successful and final resolution of the Chancery Action, or insufficient to constitute substantial compliance with the Letter of Intent.

55.    As discussed above, and unbeknownst to AeroGlobal, between June 18, 2001 and July 19, 2001, Crescent Capital, acting at the direction and control of First Islamic, continued its discussions with defendants Wood and Alan Klapmeier, among others, regarding a new First Islamic-Cirrus stock purchase agreement.  The Cirrus board had, during that time, appointed two of its members, defendants Alan Klapmeier and Wood, to be the primary contacts between Cirrus on the one hand and First Islamic and AeroGlobal on the other.  Alan Klapmeier was primarily responsible for inducing AeroGlobal to proceed with its preparations for the purchase of Cirrus' capital stock pursuant to the AeroGlobal Letter of Intent, in order that Cirrus could continue to use the prospect of a deal with AeroGlobal as a bargaining lever with First

Islamic.  Wood was primarily responsible for negotiating with First Islamic for "sweetened" terms under which First Islamic would acquire a controlling interest in Cirrus.

56.     On July 12, 2001, defendant John Dyslin, acting at the direction and control of First Islamic, spoke with defendant Wood for approximately 31 minutes.  Upon information and belief, Dyslin and Wood discussed during that telephone call the proposed terms of a new Cirrus-First Islamic stock purchase agreement.  On that same day, Wood told the Cirrus Board of Directors that he wanted to engage in negotiations with First Islamic regarding a new stock purchase agreement.

57.     On July 16, 2001, the day after Cirrus and AeroGlobal submitted to the Court of Chancery their written arguments in opposition to CHCL's motion for a preliminary injunction, and the day before the Court of Chancery was scheduled to hear oral argument from the parties, Dyslin, acting as an agent for First Islamic, made a proposal to Cirrus, both on a telephone conference call to Cirrus' senior management and/or board members and in writing, under which First Islamic again offered to purchase a controlling share of the capital stock of Cirrus for approximately $82,500,000.

58.     On Tuesday, July 17, 2001, the Court of Chancery heard oral argument on CHCL's motion for preliminary injunction, and the presiding judicial officer, Vice Chancellor Stephen P. Lamb, indicated to the parties at that court session that he would endeavor to render a decision by the end of that week, or by July 20, 2001.  In addition, and upon information and belief, representatives of Cirrus and/or Crescent Capital met and spoke in Wilmington, Delaware on July 17, 2001 to discuss First Islamic's July 16, 2001 proposal and the terms of an agreement by First Islamic to purchase a controlling interest in Cirrus.

59.     On July 18, 2001, First Islamic made a written presentation to Cirrus' Board of Directors that included the terms of First Islamic's July 16 proposal.  Also included in that presentation by First Islamic was a list of excuses suggested by First Islamic that Cirrus could use as pretexts to terminate the AeroGlobal Letter of Intent, in order to induce Cirrus to abandon the Letter of Intent in favor of the new and "improved" First Islamic deal.

60.     On July 19, 2001, the Court of Chancery denied CHCL's motion for preliminary injunction.  In so doing, the Court found that, notwithstanding the deferral of the final $3,000,000 increment of the bridge loan, Cirrus and AeroGlobal's respective presentations to the Court appeared to confirm that "there is no dispute between [Cirrus and AeroGlobal] over the enforceability" of AeroGlobal's rights under the Letter of Intent, and that "the $3 million shortfall is due entirely to the pendency of this [preliminary injunction] motion, and a resultant understanding between Cirrus and AeroGlobal that the completion of the funding should be delayed pending its outcome."

61.     On the morning of July 19, prior to the issuance of the Court of Chancery's decision, First Islamic agent Dyslin was scheduled to and, upon information and belief, actually did engage in a telephone call with defendants Atalla and Wood that lasted approximately 30 minutes.  Upon information and belief, Mr. Dyslin discussed with Atalla and Wood the July 16 offer by First Islamic and the excuses suggested by First Islamic for Cirrus' repudiation of the Letter of Intent with AeroGlobal.

62.     On July 19, 2001, First Islamic gave Cirrus, in writing, wiring instructions for the $5,000,000 termination fee provided for under Section 11.5 of the June 7, 2001 Stock Purchase Agreement.  Despite Cirrus' receipt of those wiring instructions, Cirrus failed to wire

the $5,000,000 termination fee that it owed to First Islamic, pursuant to a secret agreement

between First Islamic and Cirrus to waive payment of the $5,000,000 fee.  Moreover, and

despite Cirrus' obligation under the AeroGlobal Letter of Intent to pay the $5,000,000

termination fee to First Islamic "as soon as practicable," Cirrus concealed the fact of its receipt

of the wiring instructions from AeroGlobal.

63.    Prior to and immediately following the issuance of the Court of

Chancery's decision on July 19, AeroGlobal worked diligently to prepare a formal stock

purchase agreement between it and Cirrus, and Cirrus purported to cooperate with AeroGlobal in

that regard.  Subsequent to the July 19 ruling, Cirrus again represented to AeroGlobal that Cirrus

intended to proceed expeditiously to implement all of the transactions contemplated by the

Letter of Intent.  In that connection, Cirrus urged AeroGlobal to take steps such as directing its

counsel to perform and complete the extensive "due diligence" investigation and review

necessary to permit AeroGlobal to implement those transactions, and to undertake the costly task

of negotiating and preparing the array of documents necessary to consummate all of the

transactions contemplated by the Letter of Intent.

64.    At no time prior to August 2001 did Cirrus or any of its representatives

state to AeroGlobal or its representatives that AeroGlobal was in breach of the Letter of Intent

by failing to pay the final $3,000,000 increment of the bridge loan.

65.    At no time prior to August 2001 did Cirrus or any of its representatives

state to AeroGlobal or its representatives that Cirrus or any of its Board members were

concerned with AeroGlobal's ability to complete the $45,000,000 investment contemplated by

the Letter of Intent, and Cirrus never undertook any investigation or other inquiry to assure itself that AeroGlobal was in fact financially capable of completing the transaction.

66.    On or about July 20, 2001, Cirrus secretly retained the services of financial advisor Michael L. Bochert to compare the financial benefits to Cirrus and its management of the AeroGlobal Letter of Intent and the new First Islamic proposal.  Mr. Bochert presented his analysis to the Cirrus Board on July 23, 2001, in which he found that the AeroGlobal Letter of Intent provided more value to Cirrus shareholders than the new First Islamic proposal under two of the three scenarios that he analyzed.  The results of Mr. Bochert's analysis were concealed from AeroGlobal.

67.    Prior to July 23, 2001, Alan Klapmeier and Wood communicated to First Islamic the terms that Alan Klapmeier wished to be included in connection with the new First Islamic stock purchase agreement.  On or about July 23, 2001, First Islamic's agent Dyslin sent an e-mail to defendant Wood the subject of which was First Islamic's responses to "Alan's wish list."  Included in Alan Klapmeier's so-called "wish list" were proposals that he have veto rights with respect to personnel decisions at Cirrus, that he and his brother Dale be given the option to purchase millions of shares of Cirrus stock at favorable prices, that he and Dale be given the right  to sell, or "put," their shares of Cirrus stock to First Islamic at favorable prices, and that AeroGlobal fully release Crescent Capital, Cirrus, and First Islamic from any liability resulting from the conduct of any of those entities.  In addition, Alan Klampeier subsequently insisted that he have the use of a Cirrus aircraft for one year.

68.    First Islamic generally agreed to Alan Klapmeier's proposed terms.  In particular, First Islamic agreed, inter alia:

(a)    to give Alan and Dale Klapmeier each the option to purchase 1,000,000 shares of Cirrus stock at a price of $3.00 per share (a price substantially less than that First Islamic proposed to pay for Cirrus' shares), with the options being immediately exercisable and expiring in 10 years, and in addition to the company's employee stock option plan;

(b)    to give Alan and Dale Klapmeier each six annual cash payments of $500,000 for agreeing not to compete with Cirrus during that six-year period;

(c)    to give Alan and Dale Klapmeier increased base salaries and annual bonuses for continuing to work for Cirrus;

(d)    to give to Alan and Dale Klapmeier severance packages guaranteeing the payment of their base salaries and non-compete payments should their employment be terminated by them or by First Islamic without cause;

(e)    to give to Alan and Dale Klapmeier the right to compel First Islamic to purchase any or all of the shares of Cirrus stock that they might own at the higher price of fair market value or $4.00 per share;

(f)    to give to Alan Klapmeier the right to veto certain personnel decisions made by First Islamic;

(g)    to give to Alan Klapmeier a Cirrus aircraft for a year; and

(h)    to attempt to induce AeroGlobal to execute a full release in favor of Cirrus, Crescent Capital , First Islamic, and CHCL.

69.    At no time prior to July 23, 2001 was anyone at AeroGlobal made aware of the ongoing negotiations between Cirrus and First Islamic.  AeroGlobal first learned that such discussions might be in progress from Alan Klapmeier during a conference call on July 23,

2001. AeroGlobal immediately insisted that Cirrus and all of its employees, agents, and Board members cease such discussions immediately, pursuant to the confidentiality and no-talk provisions of the Letter of Intent.

70.    At no time on July 23, 2001 did Alan Klapmeier state to anyone associated with AeroGlobal that the excuse for the discussions with First Islamic was AeroGlobal's deferral of the final $3,000,000 bridge loan installment, or any asserted failure by AeroGlobal to comply with its contract with Cirrus.

71.    On July 25, 2001, Cirrus lawyer Jeffrey Hesson, Esquire, wrote to counsel for AeroGlobal and expressed, for the first time, the view that because AeroGlobal had not advanced to Cirrus the final $3,000,000 increment of the initial "bridge loans" under the Letter of Intent, AeroGlobal had failed to meet the explicit terms of the Letter of Intent. On information and belief, Mr. Hesson's letter was a disingenuous effort (a) to begin to lay a pretextual predicate for Cirrus to terminate the Letter of Intent in the event that Cirrus was ultimately successful in leveraging an acceptable deal from First Islamic, and, at the time, (b) to lumm AeroGlobal into believing that Cirrus still intended to complete its deal with AeroGlobal. At no point in his letter, however, did Mr. Hesson state or contend that AeroGlobal was in breach of the Letter of Intent, that Cirrus was contemplating the termination of the Letter of Intent in favor of a new stock purchase agreement with First Islamic, or that Cirrus would declare a breach if the $3,000,000 loan increment were not received by a date certain.

72.    On July 27, 2001, AeroGlobal principals Christopher Moe and Keith Fitzgerald traveled to an air show in Oshkosh, Wisconsin and, while there, met with defendants Alan Klapmeier and Dale Klapmeier, their father Larry Klapmeier, defendants Midon and

McDermott, and Cirrus Board member James Brown.  Messrs. Moe and Fitzgerald presented

Cirrus in Oshkosh with a draft of a preliminary investment memorandum that AeroGlobal was

using to solicit investors.

73.     Prior to their arrival in Oshkosh neither Mr. Fitzgerald nor Mr. Moe, nor

anyone else associated with AeroGlobal, was told by anyone acting on behalf of or associated

with Cirrus that the payment of the final $3,000,000 installment of the bridge loan to be

advanced to Cirrus under the Letter of Intent was causing concern among Cirrus' Board members

regarding AeroGlobal's ability to complete the $45,000,000 investment contemplated by the

Letter of Intent.

74.     The conduct of Cirrus and its Board in authorizing discussions with First

Islamic was directly contrary to Cirrus' representation to the Court of Chancery, and the Court's

ultimate finding, that an agreement between AeroGlobal and Cirrus existed under which

AeroGlobal would pay the $3,000,000 upon the termination of the litigation.

75.     Cirrus finally reached its new agreement with Cirrus on July 30, 2001, and

broke off all discussions with AeroGlobal on that date.  At no time prior to the Cirrus'

termination of discussions with AeroGlobal did anyone at Cirrus advise AeroGlobal that the

deferral of payment of the $3,000,000 was considered by Cirrus to be a breach of the Letter of

Intent by AeroGlobal.  The reason for Cirrus not taking the position that AeroGlobal had

breached the Letter of Intent was, upon information and belief, Cirrus knew and had been

advised that AeroGlobal was in full compliance with the Letter of Intent, as specifically known

by Cirrus throughout July, 2001.

76.     Cirrus later concocted an argument that AeroGlobal had breached the Letter of Intent in an attempt to justify Cirrus' own outrageous conduct in deceiving AeroGlobal into believing that Cirrus actually intended to proceed with the transactions contemplated by the Letter of Intent, and in using AeroGlobal as a stalking horse and negotiating lever with respect to First Islamic. Cirrus also later adopted the excuse for its conduct suggested by First Islamic, that is, that AeroGlobal lacked adequate financial resources to complete the $45,000,000 investment contemplated by the Letter of Intent.

77.     During the first week of August, 2001, Cirrus released to itself $3,000,000 of the $5,000,000 paid by AeroGlobal that had been earmarked for the payment to First Islamic of the termination fee provided under Section 11.5 of the June 7, 2001 Stock Purchase Agreement, and which Cirrus was obligated under the Letter of Intent to use for that purpose. Cirrus used that $3,000,000 to cover payroll and other ordinary operating expenses of the company. These facts were concealed from AeroGlobal.

78.     On or about August 7, 2001, Cirrus and First Islamic, acting through Crescent Capital and CHCL, entered into a new Stock Purchase Agreement under which First Islamic agreed, inter alia, to purchase 61% of the capital stock of Cirrus on a fully diluted basis for approximately $82,500,000.

79.     On or about August 13, 2001, Cirrus' new deal with First Islamic having been finally and formally documented and the first payment to Cirrus under that new deal having been made, Cirrus notified AeroGlobal that Cirrus was purporting to terminate the Letter of Intent.

80.    On information and belief, Cirrus' conduct was and continues to be part of a scheme agreed to by then-directors of Cirrus, First Islamic, Crescent Capital, CHCL and the individual defendants whereby Cirrus would claim, in bad faith, that in fact AeroGlobal breached the Letter of Intent, and that Cirrus was thereby relieved of any obligation to perform further under the Letter of Intent, and became entitled to enter into negotiations with CHCL and ultimately to enter into its new deal with CHCL.

81.    On information and belief, the Cirrus-First Islamic scheme described in paragraph 80 hereof was devised or conceived initially by defendant Griffith, defendant Dyslin acting on behalf of First Islamic, Crescent Capital and CHCL and in concert with defendants Atalla, Midon and Wood acting for themselves and on Cirrus' behalf.  In particular, as described above, these defendants conspired together in an effort to persuade and induce Cirrus' management and a majority of its Board of Directors to (a) develop a pretense that could be invoked to justify Cirrus' abandonment of the AeroGlobal transaction, (b) permit First Islamic to acquire the majority interest in Cirrus that it was temporarily denied by the Court of Chancery's July 19 ruling.

82.    AeroGlobal believes and therefore avers that, sometime shortly after Cirrus' execution of the Letter of Intent on June 17, 2001, but long prior to the Court of Chancery's July 19 ruling and the Board of Directors' vote on July 30 to abandon the AeroGlobal transaction, Cirrus' senior management personnel, including its chief executive officer Alan Klapmeier, its chief operating officer Dale Klapmeier, and its chief financial officer Peter McDermott, agreed to implement Alan Klapmeier's plan to use the AeroGlobal Letter of Intent as a negotiating lever with First Islamic, to breach the Letter of Intent and abandon the

AeroGlobal transaction under the pretense that AeroGlobal had committed a prior breach, to engineer a new and "improved" deal with First Islamic, and to enable the Klapmeiers to obtain the financial and other benefits set forth in paragraph 68, above.

## CAUSES OF ACTION

### Count I

**Securities Fraud in Violation of the Securities and Exchange Act of 1934
and Securities and Exchange Commission Rule 10b-5
AeroGlobal v. Cirrus**

83.    AeroGlobal incorporates herein by reference paragraphs 1 through 82, above.

84.    The AeroGlobal Letter of Intent is an agreement for the of securities.

85.    Cirrus used the means and instrumentalities of interstate commerce to commit fraud in the connection with the sale of securities to AeroGlobal.  Specifically, Cirrus used interstate communication wires and the mails, and traveled across interstate boundaries, in connection with executing the Letter of Intent with the fraudulent intention not to permit the completion of the $45,000,000 stock purchase contemplated by the Letter of Intent, and to use the Letter of Intent as a stalking horse and negotiating lever with respect to Cirrus' dealings with First Islamic, contrary to the explicit and implicit representations made in and in connection with the Letter of Intent.

86.    Cirrus made repeated and intentional fraudulent misrepresentations and omissions to AeroGlobal regarding Cirrus' intention to move forward and complete the stock purchase transaction contemplated by the AeroGlobal Letter of Intent, with the intent of inducing AeroGlobal to rely to its detriment on the misrepresentations and omissions and believe

the falsehood that Cirrus actually intended to move forward with the transaction contemplated by the Letter of Intent.

87.    Cirrus made repeated and intentional fraudulent misrepresentations and omissions to AeroGlobal regarding Cirrus' discussions and negotiations with First Islamic that occurred after the signing of the AeroGlobal Letter of Intent, with the intent of inducing AeroGlobal to rely to its detriment on the misrepresentations and omissions and believe the falsehood that Cirrus was actually not in negotiations and discussions with First Islamic after the signing of the Letter of Intent.

88.    Cirrus' senior managing officers, Alan and Dale Klapmeier, repeatedly lied to and concealed material information from AeroGlobal regarding Cirrus' intention to move forward and complete the stock purchase transaction contemplated by the AeroGlobal Letter of Intent and regarding Cirrus' discussions and negotiations with First Islamic that occurred after the signing of the AeroGlobal Letter of Intent, with the intent of inducing AeroGlobal to rely to its detriment on the lies and omissions, which the Klapmeiers intentionally made with the purpose of financially enriching themselves by using the Letter of Intent as negotiating leverage with First Islamic.

89.    Cirrus and the Klapmeier brothers, in fact, profited from the fraud they committed in connection with the sale of securities to AeroGlobal.

90.    As a direct and proximate result of Cirrus' fraud on AeroGlobal, AeroGlobal was deprived of the benefit of its Letter of Intent with Cirrus and has suffered monetary damages in an amount exceeding $20,000,000.

## Count II

**Controlling Person Liability Under § 20 of the Securities and Exchange Act of 1934**
**AeroGlobal v. Alan Klapmeier, Dale Klapmeier and Peter McDermott**

91.    AeroGlobal incorporates herein by reference paragraphs 1 through 90, above.

92.    Alan Klapmeier, Dale Klapmeier, and Peter McDermott are all "controlling persons" subject to individual liability under § 20 of the Securities and Exchange Act of 1934, 15 U.S.C. § 78t.

93.    Alan Klapmeier, Dale Klapmeier and Peter McDermott each approved and participated in Cirrus' fraud in connection with the sale of securities to AeroGlobal.

94.    As a direct and proximate result of the fraud of Cirrus, McDermott and the Klapmeier brothers, AeroGlobal was deprived of the benefit of its Letter of Intent with Cirrus and has suffered monetary damages in an amount exceeding $20,000,000.

**Count III**
**Breach of Contract**
**AeroGlobal v. Cirrus**

95.    The allegations of paragraphs 1 through 94 hereof are incorporated herein by reference as through fully set forth.

96.    Cirrus has breached its contractual obligations under the Letter of Intent in at least the following respects:

(a)    By failing or refusing to use its best efforts to negotiate and prepare definitive agreements to implement the stock purchase and sale transaction provided for in the Letter of Intent, as required by Section 2.a;

(b)    By failing or refusing to utilize the proceeds of the AeroGlobal bridge loan to satisfy all obligations owed by Cirrus to CHCL, including payment of the

termination fee under the Cirrus-CHCL Stock Purchase Agreement, as required by Section 1.d and Section 3.c;

(c)    By failing or refusing to issue to AeroGlobal warrants to purchase shares of Cirrus' common stock, as required by Section 1.b;

(d)    By failing or refusing to make periodic interest payments to AeroGlobal in respect of the bridge loan, as required by Section 1.a;

(e)    By failing or refusing to pay to AeroGlobal the commission amounts due with respect to the bridge loan, as required by Section 1.c;

(f)    By failing or refusing to enter into an agreement appointing AeroGlobal as Cirrus' exclusive advisor to arrange additional investments in and/or loans to Cirrus, as required by Section 2.b;

(g)    By failing or refusing to indemnify AeroGlobal and hold it harmless against liability for legal fees and expenses and other costs arising from the defense of CHCL's claims in the Chancery Action, as required by Section 3.c;

(h)    By failing to use its best efforts to terminate Cirrus' obligations to CHCL under the Stock Purchase Agreement on terms reasonably satisfactory to AeroGlobal, as required by Section 3.c;

(i)    By conducting discussions and negotiations with CHCL concerning the sale of Cirrus' capital stock, and by entering into an agreement or agreements with CHCL concerning its purchase of Cirrus' capital stock, in violation of Section 4.d; and

(j)    By failing or refusing to keep confidential and not use or disclose information obtained from AeroGlobal in connection with the Letter of Intent and the negotiation of the transactions contemplated thereby, as required by Section 4.f.

97.    As a direct, foreseeable, and proximate consequence of Cirrus' breaches of contract, AeroGlobal has suffered injury or harm to its business or property.  Such injury or harm includes but is not limited to the loss of the profits AeroGlobal would have earned had the stock acquisition contemplated by the Letter of Intent been consummated; the loss of the transaction costs and expenses AeroGlobal was unable to recoup as a result of Cirrus' failure or refusal to implement the transactions contemplated by the Letter of Intent; the loss of the benefits to AeroGlobal of being able to designate its own representatives as members of Cirrus' Board of Directors, as contemplated by Section 3.b of the Letter of Intent; the loss of the opportunity cost of AeroGlobal's $12,000,000 bridge loan; the loss of the commission amounts payable in respect of the bridge loan; and the loss of the costs and expenses incurred in defending against the Chancery Action, as a result of Cirrus' failure or refusal to indemnify AeroGlobal against such costs and expenses.

98.    AeroGlobal has fully performed all of its obligations under the Letter of Intent.

99.    As a result of Cirrus' breaches of contract, AeroGlobal is entitled to an award of compensatory damages from Cirrus in an amount of not less than $20,000,000.

## Count IV

### Breach of the Covenant of Good Faith and Fair Dealing
### AeroGlobal v. Cirrus

100.    Paragraphs 1 through 99 hereof are incorporated herein by reference as though fully set forth.

101.    By operation of law, the Letter of Intent contained an implied term or covenant requiring Cirrus to act in all respects in good faith toward AeroGlobal with respect to the transactions contemplated by and provided for in the Letter of Intent, and to deal fairly with AeroGlobal with respect to such transactions.

102.    Cirrus breached the implied covenant of good faith and fair dealing in at least the following respects:

(a)    By failing or refusing to use its best efforts to implement the stock purchase acquisition contemplated to the Letter of Intent;

(b)    By failing or refusing to terminate its relationship with First Islamic despite AeroGlobal's payment of the $5,000,000 necessary to fund the First Islamic termination fee;

(c)    By inducing AeroGlobal, both before and after the Court of Chancery's July 19 ruling, to believe that Cirrus intended to proceed diligently to implement the transactions contemplated by the Letter of Intent, when in fact Cirrus had no such intent and was merely seeking to induce AeroGlobal to pay additional amounts pursuant to the bridge loan provisions of the Letter of Intent;

(d)    By concealing from AeroGlobal the fact that while Cirrus was, ostensibly, taking steps to implement the transactions contemplated by the Letter of Intent, it was actually negotiating a new deal with CHCL pursuant to which Cirrus, not CHCL, would receive the $5,000,000 termination fee funded by AeroGlobal;

-34-

(e)    By releasing to itself $3,000,000 of the $5,000,000 that was advanced by AeroGlobal pursuant to the Letter of Intent, and using such funds for working capital; and

(f)    By devising, as a pretense for Cirrus' non-performance of its own contractual obligations, a claim that AeroGlobal failed to meet its obligations to find the final $3,000,000 increment of the bridge loan, notwithstanding Cirrus' representations in the Chancery Action that the parties had agreed to defer payment of such final increment.

103.    Cirrus' bad faith conduct was malicious and outrageous, and was undertaken knowingly and fraudulently with the intent to deceive and injure AeroGlobal, to deprive AeroGlobal of its money and of the investment opportunity for which it had bargained, to confer on Cirrus benefits to which it was not entitled (including AeroGlobal's $12,000,000), and to enable Cirrus' senior management personnel to use AeroGlobal's Letter of Intent as a "stalking horse" and negotiation lever to elicit from First Islamic a premium price for their stock and valuable benefits for Alan and Dale Klapmeier.

104.    As a direct, proximate and foreseeable consequence of Cirrus' bad faith conduct, AeroGlobal has suffered injury and harm to its business or property in at least the respects alleged in paragraph 97, above.

105.    As a result of Cirrus' bad faith conduct, AeroGlobal is entitled to an award of compensatory damages from Cirrus in an amount not less than $20,000,000, and to an award of punitive damages from Cirrus in an amount of at least $25,000,000.

## Count V

### Intentional Interference With Contract and Prospective Business Relations
### AeroGlobal v. First Islamic, CHCL, Crescent Capital, Griffith, Atalla, Midon and Wood

106.    The allegations of paragraphs 1 through 105 hereof are incorporated herein by reference as though fully set forth.

107.    Beginning sometime on or after the date of  the execution and delivery of the Letter of Intent, June 17, 2001, and continuing at least through Cirrus' formal termination of the Letter of Intent, August 13, 2001, defendants CHCL, Crescent Capital, First Islamic and Griffith, with full knowledge and awareness of the terms of the Letter of Intent and the "Exclusive Negotiations" provisions of Section 4.d thereof, repeatedly contacted and communicated with Cirrus and its representatives in an effort to induce and persuade Cirrus to abandon the AeroGlobal transaction, engage in the breaches of contract described in paragraph 96 hereof, commit the acts of bad faith described in paragraph 102 hereof, and enter into a new transaction with CHCL pursuant to which First Islamic would acquire a majority of Cirrus' common stock and Cirrus would retain the $5,000,000 originally earmarked by Cirrus and AeroGlobal for payment of the CHCL termination fee.

108.    Sometime on or after June 17, 2001, and continuing at least through August 13, 2001, defendants Atalla, Midon and Woods, with full awareness of the terms of the Letter of Intent and of the "Exclusive Negotiations" provisions of Section 4.d thereof, agreed to and did participate and act in concert with defendants First Islamic, CHCL, Crescent Capital and Griffith in seeking to induce and persuade Cirrus' senior management personnel and a majority of Cirrus' Board of Directors to abandon the AeroGlobal transaction, engage in the breaches of contract described in paragraph 96 hereof, commit the acts of bad faith described in paragraph

102 hereof, and enter into a new transaction with CHCL pursuant to which First Islamic would acquire a majority of Cirrus' common stock and Cirrus would retain the $5,000,000 originally earmarked by Cirrus and AeroGlobal for payment of the First Islamic termination fee.

109.    In order to induce and persuade Cirrus' senior management to cause the company to abandon the AeroGlobal transaction and breach Cirrus' obligations under the Letter of Intent, First Islamic, CHCL, and Crescent Capital effectively bribed Alan and Dale Klapmeier by offering them financial and other benefits in connection with the eventual sale of Cirrus' stock to First Islamic, as described in paragraph 68 hereof.

110.    As a direct, foreseeable and proximate consequence of the defendants' tortious and unjustified interference with AeroGlobal's contract and with its prospective business relations with Cirrus, AeroGlobal suffered injury and harm to its business and property in the respects described in paragraph 97 hereof.

111.    As a result of the defendants' tortious and intentional interference with AeroGlobal's contract and within its prospective business relations with Cirrus, AeroGlobal is entitled to an award of compensatory damages from defendants First Islamic, CHCL, Crescent Capital, Griffith, Atalla, Midon and Woods, jointly and severally, in an amount of not less than $20,000,000, and to an award of punitive damages from such defendants, jointly and severally, in an amount of at least $25,000,000.

## Count VI

### Civil Conspiracy
### AeroGlobal v. All Defendants

112.    The allegations of paragraphs 1 through 111 hereof are incorporated herein by reference as though fully set forth.

113. AeroGlobal is informed and believes and therefore alleges that, beginning sometime on or after June 17, 2001 and continuing at least through August 13, 2001, each defendant combined, conspired and agreed with each other defendant to bring about and accomplish Cirrus' abandonment of the AeroGlobal transaction, Cirrus' breach of its contractual obligations to AeroGlobal as described in Count II hereof, and Cirrus' acts of bad faith and unfair dealing toward AeroGlobal, as described in Count III hereof.

114. In addition, AeroGlobal is informed and believes and therefore alleges that, beginning sometime on or after June 17, 2001 and continuing at least through August 13, 2001, defendants First Islamic, CHCL, Crescent Capital, Griffith, Atalla, Midon and Wood combined, conspired and agreed with each other to bring about and accomplish the tortious interference with AeroGlobal's contract and its prospective business relations with Cirrus, as described in Count IV hereof.

115. The exact dates, places and content of the defendants' conspiratorial communications with one another, and the dates and nature of all of the overt acts undertaken in furtherance of their conspiracies, are within the exclusive knowledge and control of the defendants, except as noted in the factual recitation above. AeroGlobal is informed and believes and therefore alleges that the conspiracies were effected and implemented through, among other means and methods, repeated contacts and communications between First Islamic, CHCL and Crescent Capital, and Griffith, acting for Atalla, Midon, Wood and Cirrus, and later through direct contacts between First Islamic, CHCL and Crescent Capital with Cirrus' senior management personnel, including Alan and Dale Klapmeier and Peter McDermott.

116.    The conspiracies alleged in paragraphs 113 through 115 hereof were conceived, entered into and implemented maliciously and with the intention of injuring AeroGlobal in its business or property, with the intention of depriving it of money and rights to which it was contractually entitled, and with the intention of misappropriating and conferring on First Islamic, CHCL, Crescent Capital, Cirrus and Alan and Dale Klapmeier benefits and funds to which they were not entitled.

117.    As a direct, foreseeable and proximate consequence of the conspiracies alleged in paragraphs 113 through 115 hereof, AeroGlobal has suffered injury or harm to its business or property in at least the respects alleged in paragraph 97 hereof.

118.    As a result of the defendants' conspiracies, and each of them, AeroGlobal is entitled to an award of compensatory damages against the defendants, jointly and severally, in an amount of not less than $20,000,000, and to an incurred punitive damages against the defendants, jointly and severally, in an amount of at least $25,000,000.

WHEREFORE, AeroGlobal requests that judgment be entered in its favor and against the defendants, as follows:

(a)    Against defendants Cirrus, Alan Klapmeier, Dale Klapmeier and Peter McDermott, jointly and severally, pursuant to Counts I and II for compensatory damages in an amount of not less than $20,000,000, together with interest and costs, plus attorneys fees;

(b)    Against defendant Cirrus pursuant to Counts III and IV for compensatory damages in an amount of not less than $20,000,000, together with interest and costs;

(c)    Against defendant Cirrus pursuant to Count III for punitive damages in an amount of at least $25,000,000, together with interest and costs;

(d)    Against defendants First Islamic, CHCL, Crescent Capital, Dyslin, Griffith, Atalla, Midon and Wood, jointly and severally, pursuant to Count V for compensatory damages in an amount of at least $20,000,000, together with interest and costs;

(e)    Against defendants First Islamic, CHCL, Crescent Capital, Dyslin, Griffith, Atalla, Midon and Wood, jointly and severally, pursuant to Count V for punitive damages in an amount of at least $25,000,000, together with interest and costs;

(f)    Against all defendants, jointly and severally, pursuant to Count VI for compensatory damages in an amount of not less than $20,000,000, together with interest and costs;

(g)    Against all defendants, jointly and severally, pursuant to Count VI for punitive damages in an amount of at lest $25,000,000 together with interest and costs; and

(h)    For such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMAND

AeroGlobal demands a jury trial on all issues so triable.

Respectfully submitted,

Dated:  July 24, 2002

_____
Paul R. Rosen
Timothy C. Russell
Michael C. Wagner

-40-

SPECTOR GADON & ROSEN, P.C.
1635 Market Street, 7th Floor
Philadelphia, PA  19103
(215) 241-8888
(215) 241-8844 (fax)

Attorneys for Plaintiff
AeroGlobal Capital Management,
LLC.

F:\27647\002\Pleadings\FederalComplaintRev'd.wpd